UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IN RE CREDIT ACCEPTANCE
CORPORATION SECURITIES
LITIGATION

Consolidated Master File
Case No. 98-70417

Hon. Nancy G. Edmunds

_____/

## OPINION & ORDER GRANTING DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

This matter comes before the Court on Defendants' motion to dismiss Plaintiffs' Second Amended Consolidated Class Action Complaint.   This Court previously granted Defendants' motion to dismiss Plaintiffs' initial complaint, finding it insufficient to state a claim for securities fraud because it failed to adequately allege scienter. At the time of the Court's decision, widespread disagreement existed among the district courts with respect to whether allegations of recklessness were adequate to meet the scienter requirement.   Following this Court's decision, the Sixth Circuit clarified the pleading standard in this area and this Court granted Plaintiffs' motion for leave to amend their complaint. As discussed below, Plaintiffs have failed to satisfy the pleading requirements, as articulated by the Sixth Circuit.  Therefore, the motion to dismiss the Second Amended Consolidated Class Action Complaint is GRANTED.



## I. The Counts and the Parties[1]

### A. Complaint Alleges Two Counts

In this consolidated class action lawsuit,[2] the shareholder Plaintiffs allege that the Defendants, Credit Acceptance Corporation ("CAC"), and three of its individual officers, Messrs. Donald Foss, Richard Beckman, and Brett Roberts, engaged in securities fraud. Specifically, Plaintiffs' Second Amended Consolidated Class Action Complaint (hereinafter "Amended Complaint") alleges two Counts: (1) a violation of Section 10(b) of the Securities Exchange Act of 1934, ("Exchange Act"),15 U.S.C. § 78(j)(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5; and (2) a violation of Section 20 of the Exchange Act, 15 U.S.C. § 78(t)(a), for "controlling person" liability on the part of Foss, Beckman and Roberts.

### B. The Parties

The Defendant Corporation, CAC,  is a financial services company that generates revenue by providing sub-prime, high-risk, 'D' grade loans to used car purchasers through car dealers. Specifically, CAC finances consumer used car purchases by accepting assignments of installment contracts entered into by the purchaser and the car dealer. The installment contract represents the amount financed, i.e., the purchase price of the car less any down payment received by the dealer from the customer.

Under its agreement with car dealers, CAC gets 20% of the payments received on an installment contract as its servicing fee, and the dealer is entitled to the remaining 80%. At the

---

[1] To the extent that the parties and some of the background information is the same as it was when the Court originally considered the motion to dismiss, it is repeated below, taken from the Court's earlier opinion. See Opinion & Order Striking Affidavit and Granting Defendants' Motion to Dismiss, April 23, 1999.

[2] Although Plaintiffs have pled this suit as a class action, the Court has not certified it as such.

2

time it accepts a contract from a dealer, CAC advances the dealer a percentage of the amount the dealer is entitled to receive in the event that the consumer makes all the payments. The percentage advanced is dependent on several factors including the dealer rating, the percentage of the down payment to the total purchase price, the customer's credit rating, the car's value, and the value of add-on products, such as insurance.

When CAC accepts assignment of a contract, it records: (1) the gross amount of the installment contract as an installment contract receivable; (2) CAC's servicing fee as an unearned finance charge; and (3) the remainder of the amount due under the contract as a dealer holdback. If the contract meets the criteria for an advance, the dealer is advanced a portion of the amount due it, which is netted against the dealer holdback.

In order to provide for potential losses resulting from installment contracts that are uncollectible, CAC maintains a reserve for future credit losses. If CAC cannot collect the entire amount of a contract, the uncollected balance is charged off against dealer holdbacks, unearned finance charges, and the allowance for credit losses. CAC also keeps a reserve for losses on dealer advances that may not be recovered.

Plaintiffs owned, acquired, or purchased stock in CAC during the time period of August 14, 1995 through October 22, 1997, the designated "class period." They represent themselves and all others similarly situated.

## II. A Summary of the Complaint's Allegations

### A. Actions by Credit Acceptance Corporation

The precipitating event that led to the filing of this lawsuit occurred on October 22, 1997 when CAC issued a press release announcing a loss for the third quarter of 1997. This loss resulted from a decision by CAC management to increase its reserve for credit losses. CAC had

3

recently installed new software that it claims allowed it to more accurately assess the credit risks it was undertaking by financing used cars.  As a result of the new computer program, CAC determined that it must increase its credit loss reserves.  Following an adjustment which added $60 million to the loss reserve pool,  CAC's stock dropped from $9.75 per share to $6.00 a share on October 23, 1997.[3]  (Pls' Second Am. Compl. at ¶ 130).  Prior to this drop, CAC had reported five successive years of increases in quarterly earnings.  Id. at ¶ 31.

Plaintiffs' Amended Complaint alleges that Defendants knew its loan loss reserves were inadequate and that CAC's stock was fraudulently overvalued.  Plaintiffs allege the following conduct on the part of Defendants:

> (a) Defendants artificially inflated the Company's revenue by entering into transactions with dealers whereby "deal enrollment fees" paid to CAC and included as revenue were paid back to these same dealers in the form of additional loan advances to create the appearance of a growing legitimate dealer base less prone to commit the fraudulent practices that pervade the used car industry or whereby the deal enrollment fees were paid with non-recourse promissory notes or were not paid at all.
>
> (b) Defendants artificially inflated the Company's earnings by maintaining grossly inadequate provisions for loan loss reserves and wilfully manipulated the Company's loan advance loss reserves and dealer holdbacks to fraudulently present the appearance of increased quarterly earnings.
>
> (c)  Defendants failed to disclose that the Company was unable to effectively monitor the Company's dealer loan pools as represented by the Company in its SEC filing.  Indeed, only after the Class Period did the Company admit that it was unable to evaluate dealer pools on a net basis.
>
> (d)  Defendants failed to disclose that the Company knowingly or recklessly exposed itself to increasingly greater credit losses by recklessly financing "junk cars" valued at inflated retail prices through inordinately high advances with substantially increased risk because of the limited actual value of the underlying substandard collateral.

---

[3] Subsequently, in October 1999, CAC wrote-off an additional $60.3 million pre-tax charge against earnings. (Pls' Second Am. Compl. at ¶¶ 141A-141B).

(e)  Defendants misrepresented to analysts and the investing public that the Company had consistent underwriting standards and that these credit risk management standards, assured with respect to subprime, "D"-rated credit transaction, that the Company advanced less than the wholesale value of the car.  By recklessly advancing more than the wholesale value of the car and/or refunding the dealer enrollment fees, Defendants exposed the Company to increased risk, and diminished the credit cushion purportedly maintained by the Company's utilization of dealer holdback against reimbursement for dealer advances.

(Pls' Second Am. Compl. at ¶¶ 3(a)-(e)).

Plaintiffs contend that as a result of these activities, discussed more fully below, CAC misrepresented that it had a stable business model, and overstated its financial results by grossly understating its reserves for credit losses.  Id. at ¶¶ 4-6.

### 1. Improper Refunds of Dealer Enrollment Fees

The first source of alleged fraud involves CAC's dealer enrollment fees.  Plaintiffs allege that the dealer enrollment fees were actually "fictitious revenues" because those amounts were paid back to dealers in the form of advances. (Pls' Second Am. Compl. at ¶¶ 58-61)  When a dealer enrolls with CAC, it is required to pay an enrollment fee of $4,500.  According to CAC, this fee was charged to create a barrier to entry for CAC competitors because a dealership that pays the enrollment fee will be less likely to enroll with another finance company.  The fee is also claimed to discourage "fly-by-night" dealers from joining, and covers administrative costs.

Plaintiffs repeat the allegation that the fees were not actually revenue, as accounted for, because the fees were paid back in the form of dealer advances.  Plaintiffs allege CAC failed to disclose that new dealers received as much as $5,000 in advance checks in excess of underwriting procedures.  Id. at ¶ 62.  "[B]y instituting this pay-back scheme, [CAC] substantially increased its risk on its advance pool because the Company was advancing $5,000 more in

5

advances to each new dealer than its "normal" underwriting standards would permit. . . . [T]hese extraordinary advances, at a minimum, should have been expensed and treated as a deposit." Id. Plaintiffs claim CAC's failure to disclose the pay-back scheme improperly inflated revenues and misled the investing public regarding the amount of risk CAC undertook. Id. at ¶ 61.

In addition to what was previously alleged, the Amended Complaint asserts that beginning in April of 1996, CAC ceased collecting dealer enrollment fees. Id. at ¶ 65. Instead, CAC permitted dealers to sign promissory notes, which were frequently unpaid. According to three managers interviewed the dealers were not sued for non-payment of the promissory notes. Id. at ¶ 66. Plaintiffs allege the promissory notes were illusory and should not have been recognized as revenue. Id.

### 2. Overvalued Used Cars

Next, Plaintiffs repeat the contention that the value of the cars that CAC financed were grossly overvalued. (Pls' Second Am. Compl. at ¶ 69-72)  One of the ways in which CAC allegedly justified low loan loss reserves and allayed fears concerning uncollectible D grade loans was by allegedly placing a high value on the security interest that CAC obtained in the vehicles as a result of the sale.  Plaintiffs contend that in reality the cars were overvalued because the dealers intentionally disregarded and misused Kelley Blue Book value estimation standards. Id. at ¶¶ 71-72. Plaintiffs allege  CAC allowed dealers to (1) value "junk cars" in need of significant repairs as if they have already been reconditioned; (2) fail to deduct value for excessive mileage; (3) add amounts for worthless vehicle add-ons; (4) use Kelley Blue Book valuation methods for cars, failing to account for the harsh effects that Midwest weather has on them; and (5) value cars

based upon Kelley Blue Book valuation methods which are 28-45% higher than the NADA Guide even when the appropriate weather conditions are taken into account. Id. at ¶¶ 69-78.

Plaintiffs' Amended Complaint supplements the Kelley Blue Book allegations by alleging in paragraphs 73-78 that CAC management had knowledge that harsher weather conditions in the Midwest would have a deleterious effect on the value of CAC's collateral. Plaintiffs refer to other litigation pending against CAC and quote from the testimony of Defendant Beckman which tends to show that he was aware that car values are higher on the West Coast due to the climate. Id. at ¶ 74. In addition, Plaintiffs emphasize the overpriced values in the Kelley Blue Book by citing to articles from the Los Angeles Times and from Microsoft's CarPoint Internet website which discuss the high tax writeoff that can be obtained through car donation. Id. at ¶¶ 76-77. Finally, Plaintiffs allege that according to one regional manager, Defendant Foss was aware of and advocated for the use of the Kelley Blue Book valuation method, despite its effect of overvaluing the collateral. Id. at ¶ 78.

### 3. Alleged Violations of Underwriting Standards

Further, Plaintiffs repeat the allegation that CAC engaged in risky and inconsistent underwriting practices. (Pls' Second Am. Compl. at ¶ 79). CAC allegedly increased the amount advanced to the dealers on cars, although CAC knew the cars were of substandard collateral value and that the customers had a high risk of default. Plaintiffs allege, "Initially, CAC based its advance amount on the lesser of two formulas – either 150% times the new down payment or 50% of the unpaid balance. At an unspecified time, however, CAC allegedly changed these percentages to 195% and 65% respectively. By December of 1995, CAC utilized an entirely new computation: "50% of the amount financed but no greater than 50% of the Kelley Blue Book retail

7

value to the vehicle." Id. After giving an example from another lawsuit involving Larry Lee's Auto, owned by Defendant Foss, of how CAC advanced more to the dealerships than they should have based on the actual value of the collateral, Plaintiffs contend that "CAC's loan loss reserve should have increased in light of the substandard collateral that CAC obtained as its security interest." Id. at ¶ 85.

### 4. Violations of GAAP

As they alleged previously, Plaintiffs contend that Defendants violated Generally Accepted Accounting Principles ("GAAP"), specifically, Financial Accounting Statement No. 5, which requires that all estimated losses be accrued and reported against current income. (Pls' Second Am. Compl. at ¶ 51). Plaintiffs allege that by understating the adequacy of its loan loss reserves, CAC materially overstated its earnings and net income. More specifically, Plaintiffs allege that the 10-Qs and 10-Ks filed between June 1995 and June 1997 violated the following GAAP principles:

> (1) The principle that the financial information presented should be complete; the substance rather then the form of a transaction should be reflected; items included in the financial statement be reliable corroborated by outside evidence (verifiability); and the financial statement should contain and disclose relevant, understandable, and timely information for the economic decisions of the user was violated (FASB Statement of Concepts No. 2);
>
> (2) The principle that the financial statement provide reliable financial information about the enterprise for the economic decisions of the use was violated (FASB Statement of Concepts No., 1 and No. 2);
>
> (3) The principle that estimated losses should be accrued was violated (FASB Statement No. 5);
>
> (4) The repossessed collateral was not valued in accordance with FASB 15 and the AICPA Finance Company Accounting and Audit Guide, and;

8

(5) The principles governing interim reporting was violated (Accounting Principles Board Opinion No. 28).

(Pls' Second Am. Compl. at ¶ 56).

Plaintiffs allege these violations resulted in materially false and misleading financial statements and that during the class period CAC's "net income, net assets, and revenue were materially overstated." Id. at 57.

### 5. Additional Allegations re: CAC's Loan Portfolio

At paragraphs 86-112 of the Amended Complaint, Plaintiffs make the additional allegations that CAC "built up a large proportion of CAC's expanding loan pool portfolio by joining forces with a dishonest network of companies that fraudulently preyed on low income purchasers through public car auction schemes." (Pls' Second Am. Compl. at p. 36).

### a. Ruiz and Marshall Litigation

In support of this assertion, Plaintiffs cite to unrelated consumer litigation against CAC and dealers with whom CAC did business. (E.g., the Ruiz litigation, the Marshall litigation). These consumer fraud actions allege that low-value high-mileage used cars were sold to unsuspecting consumers at inflated prices by Leadco, Inc., in collaboration with CAC, at various public auction sites. Id. at ¶¶ 91-92. Plaintiffs contend that testimony from the Dinkins action, pending in Michigan state court, reveals that Defendant Beckman had the ability to use an Excel spreadsheet to monitor the performance of the Leadco loan pools and that Defendants knew or should have known of Leadco's fraudulent practices. Id. at ¶ 96.

### b. Lemon Aid

In order to bolster the previous complaint, Plaintiffs cite to various media accounts and newspaper articles which describe allegedly unfair business practices on the part of certain dealers with which CAC conducted business.  For example, Plaintiffs cite to an article published in the March 19, 1999 edition of the Washington City Paper entitled "Lemon Aid" which gives examples of an individual with poor credit who purchased a "lemon" at 22% interest, for an amount $5,000 greater than the Kelley Blue Book value. (Pls' Second Am. Compl. at ¶ 98).  The article describes how CAC quickly descended upon the purchaser when she defaulted on her payments after the car became defunct.  Id.  The article also explains that CAC's default rate is allegedly much higher than CAC estimates.  Id. at ¶ 99.  Plaintiffs' contention is that given that some of CAC's largest affiliated dealerships (i.e., Eastern Motors) and CAC itself are currently or have been involved in consumer fraud litigation throughout the country, Defendants knew or should have known that it was risky to do business with these dealerships.  Id. at ¶ 101.  Plaintiffs contend that CAC used inconsistent underwriting standards and induced customers to agree to car deals they could not afford.  Id. at ¶ 103.  Plaintiffs allege that "it was a virtual certainty that these customers would default, which ultimately increased CAC's default rate and negatively impacted its earnings."  Id.

### c. 20/20

Additionally, Plaintiffs include in their Amended Complaint excerpts from the transcript of a 20/20 news exposé which aired on ABC on June 30, 1995. (Pls' Second Am. Compl. at ¶ 106-107)  This news program highlighted the allegedly shoddy business practices of Defendant Foss's Auto World in Atlanta, Georgia.  The quoted transcript highlights an example of a

customer buying a lemon.  Following the quoted language Plaintiffs add: "This example involving a Don Foss [a]uto dealership, further demonstrates the widespread scope and geographical reach of CAC's fraudulent and unsound business tactics and practices, which it concealed from the public during the class period." Id. at 107.


### d. Minnesota Litigation  a/k/a "LaBarre Litigation"

Plaintiffs also cite to the LaBarre litigation, pending in Minnesota. The suit involves charges that CAC violated the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c)-(d), by improperly overcharging purchasers higher-costing collateral insurance which was not authorized by them.  (Pls' Second Am. Compl. at ¶ 109-110).   The Eighth Circuit recently ruled that the case could go forward against CAC under the RICO statute. LaBarre v. Credit Acceptance Corp., 175 F.3d 640 (8th Cir. 1999).


### e. Missouri Litigation a/k/a Fielder Litigation

Finally, Plaintiffs add reference to the Fielder Litigation, which has been pending in Missouri since the fall of 1996.  Fielder is another consumer fraud class action alleging that CAC overcharged its borrowers for "official fees" and for "post-maturity interest."  (Pls' Second Am. Compl. at ¶ 111).  Plaintiffs contend that the violations alleged in Fielder, "exemplify additional examples of how CAC artificially inflated its revenue streams during the Class Period while knowingly and recklessly concealing or misrepresenting these facts to the public." Id. at 112.

### 6.   Material Misstatements to Securities Analysts

In paragraphs 113-122 of the Amended Complaint, Plaintiffs contend that "Defendants made material misstatements to securities analysts and used them as a conduit to provide false information to securities markets." (Pls' Second Am. Compl. at p. 48).  As alleged previously, Plaintiffs contend that CAC mislead market analysts by making misrepresentations to them in September of 1995 when CAC was doing a "roadshow" in connection with a Secondary Offering. Id. at ¶ 115.   During the roadshow, Plaintiffs contend that CAC touted that it had successful credit risk management techniques, including a representation that CAC advanced less than the wholesale value of the car.  Plaintiffs contend this was false and misleading because in fact CAC frequently advance more. Id.  Plaintiffs allege that Defendants' repeated and frequent interaction with the analysts caused or encouraged them to issue favorable reports concerning CAC. "Defendants used these communications to falsely present the operations and allegedly successful prospectus of [CAC] to the marketplace in order to artificially inflate the market price of [CAC's] common stock. Id. at ¶ 120.

Plaintiffs allege that a report prepared by Oppenheimer & Co. in July of 1997 noted that "[CAC] [m]anagement is confident that it can at least maintain the current earning pace through 1997 and is cautiously optimistic with respect to 1998." Id. at ¶ 121.  Plaintiffs allege that this information was provided to Oppenheimer by either Defendant Roberts or Beckman "while the Company was in the process of a massive review of its loan pools and knew that large loan loss reserves would negatively affect future earnings." Id.  Finally, Plaintiffs contend that the individual Defendants' positions with respect to CAC made each "privy to non-public information concerning" CAC.  "Because of this access, each of these Defendants knew that the adverse

facts specified herein were being concealed and that the public statements being made by the Company were false." Id. at ¶ 122.


### 7. Red Flags

In paragraphs 123-128 of the Amended Complaint, Plaintiffs set forth numerous "red flags" which they contend should have alerted Defendants to the inadequacy of its loan loss reserve pool. (Pls' Second Am. Compl. at p. 51). The following six "red flags" were allegedly disregarded by Defendants:

1. As of December 31, 1996 nearly half of CAC's loans that could be 120 days delinquent, were delinquent. Id. at ¶ 123.

2. CAC's charge-off policy was more lenient that its competitors, which yielded a greater likelihood of defaults. Id. at ¶ 124.

3. The ratio of cash collections to average gross portfolio declined from 50% in 1994 to 38% in 1996. Id. at ¶ 125.

4. Between 1994 and 1996, dealer advances as a percentage of outstanding contracts increased from 27% to 40%, and dealer holdback payments as a percentage of average portfolio declined from 31% to 12%. These figures allegedly signaled that the risk of loss on contracts was increasing. "According to one regional manager, CAC was aware of substantial problems with its loan portfolio in February of 1997 and internally implemented changes in its dealer rating system because of these problems." Id. at ¶ 126.

5. The fraudulent practices of CAC-affiliated dealers contributed to the Company's deteriorating loan portfolio and ultimate decision to take the large loan charge. Id. at ¶ 127.

6. The numerous lawsuits pending against CAC throughout the country were ignored.

## B. Defendants' Knowledge of the Fraud

In paragraphs 142-165 of the Amended Complaint, Plaintiffs allege Defendants acted with scienter. Plaintiffs base their allegations concerning Defendants' knowledge of the fraud on the following: (1) the totality of the circumstances (¶ 142); (2) the refunding of dealer enrollment fees (¶ 143); (3) the intentional overstatement of earnings (¶ 143); (3) misstatements to industry analysts (¶ 143); (4) Defendant Foss' involvement and ownership of Larry Lee's Auto Centers and his and CAC's knowledge of the sale of junk cars by CAC's dealer base (¶¶ 144-50); (4) the interrelationship between CAC and Larry Lee's (¶¶ 151-52); (5) the fact that Defendant Foss's dealerships performed significantly worse than the model dealership loan pools provided by CAC to prospective dealers, investors, and analysts (¶¶ 153-56); (6) Defendants' motive and opportunity to commit fraud, including stock sales by Defendants, note sales by CAC, stock for stock acquisitions by CAC, and CAC's line of credit (¶¶ 157-62); and finally, (7) the alleged GAAP violations (¶¶ 163-65). All of these factors are alleged to be evidence of conscious or reckless misbehavior.

### 1. Defendant Foss and Larry Lee's Auto Centers

Individual Defendant Foss owned and controlled a series of Larry Lee's Auto Centers during the time period in question. Larry Lee's did business with CAC. Larry Luedeman, a/k/a Larry Lee, testified in a series of cases filed in Akron, Ohio ("Akron Litigation") that Defendant Foss personally participated in the management of Larry Lee's and that he personally approved and encouraged Larry Lee's to market and sell overvalued used cars. (Pls' Second Am. Compl. at ¶¶ 147-48). According to the testimony of Michael Knoblaugh, the vice president of collection at CAC, "the most common excuse for a customer missing their first payment to CAC was 'the

14

car broke down.'" Id. at ¶ 149. Knoblaugh also mentioned that other factors contributed to the probability of default, including cars that did not last for the term of the contract, and cars which were sold over the standard guidebook price. Id. Tom Ciatti, regional manager of Larry Lee's, allegedly had a reputation in the industry for selling poorly reconditioned used cars. Id. at ¶ 150.

CAC and Larry Lee's Auto have the same registered corporate address. Both CAC and Larry Lee's have a relationship with Larry Lee's Finance Center d/b/a the Dealer Enterprise Group, which also has offices at the same corporate address. The Dealer Enterprise Group, which responds to consumer complaints on behalf of CAC and Larry Lee's, is owned by the Foss Trust. Several individuals serve in dual capacities for both CAC and Larry Lee's. For example, Defendant Beckman who is the Chief Operating Officer and President of CAC was also the Vice President and Treasurer of Larry Lee's Auto. Id. at ¶¶ 151-52. Plaintiffs allege that the interrelationship between the two companies charges Defendants with knowledge of the allegedly shoddy business practices of Larry Lee's.

Plaintiffs allege that the dealerships owned by Foss, which comprised 4% of the dealers CAC conducted business with, had collection rate percentages much lower than the model dealerships presented to analysts and investors. For example, the model dealerships had a monthly collection rate of 6.266% on the regular status loan pool, a monthly collection rate of 1.785% on the collection loan status pool, with an overall rate of 4.811%. Plaintiffs allege Defendants knew these collection rates were unrealistic because the Foss dealerships had much lower collection rates. For example, for the month of July 1995, Larry Lee's Akron Dealership had a collection rate of the regular status pool of 2.694%, and a collection rate for the collection loan status pool of 2.605%, for an overall rate of 2.684%. Id. at 153-54.

15

Plaintiffs contend that "Defendants knew or were reckless in not knowing about the abysmal performance of the Larry Lee's Auto pools since the four largest dealers for the month of June, 1995 were Larry Lee's Auto dealers. Defendants knowingly and/or recklessly failed to take appropriate loan loss reserves when such losses were inevitable due to the dismal performance of the Larry Lee's Auto and similarly performing pools." Id. at ¶ 156.

### 2. Motive and Opportunity

As alleged previously, Plaintiffs contend that Defendants Foss and Beckman had strong motives and opportunities to commit fraud. (Pls' Second Am. Compl. at ¶ 157). They each had a strong incentive to issue false and misleading financial statements because they benefitted personally from the stock's overvaluation. The Amended Complaint alleges that both Foss and Beckman profited from their fraud because each sold CAC stock during the Class Period. Foss sold 2,425,000 shares resulting in proceeds of nearly $60 million. Likewise Beckman sold 80,000 shares resulting in proceeds of nearly $2 million. Id. at ¶¶ 158-59. No stock sales are alleged by Roberts. Further, CAC itself sold $70 million of Senior Notes at more favorable interest rates allegedly due to Defendants' fraud. Id. at ¶ 160. Plaintiffs allege that on December 11, 1996, CAC acquired Montana Investment Group in exchange for 200,000 shares of CAC stock. Plaintiffs assert that by artificially inflating the price of the stock, CAC was able to acquire the investment group using less shares. Id. at ¶ 161. Also, Plaintiffs allege Defendants' fraud allowed CAC to more than double its financial line of credit. Id. at ¶ 162.

16

### 3. GAAP Violations Allegedly Indicate Conscious/Reckless Misbehavior

Lastly, Plaintiffs allege, as they did previously, that the violations of GAAP, are evidence of conscious or reckless misbehavior on the part of Defendants. (Pls' Second Am. Compl. at ¶¶ 163-65). Plaintiffs contend that Beckman and Foss, because of their high-level, executive positions with the company, were "fully aware of or consciously disregarded the risks of [CAC] inadequately setting its loan loss reserves." Id. at ¶ 163. Plaintiffs claim that the "frequency and magnitude of Defendants' false and misleading statements is strong evidence that Defendants acted with knowledge of the falsity of their statements or, at a minimum, with a conscious disregard for their falsity." Id. at ¶ 164. Plaintiffs allege:

> Defendants knowingly and recklessly failed to take appropriate charges against the reserve, or in excess of the reserve, despite Defendants' intimate familiarity with the "junk cars," of little or no collateral value, that permeated [CAC] dealer pools, including the Larry Lee's Auto dealership pools that were owned by Defendant Foss.

Id. at ¶ 165.


## III. Standard for Motion to Dismiss

### A. Fed.R.Civ.Pro. 12(b)(6)

In considering a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) this Court "must construe the complaint in the light most favorable to the plaintiff, accept all factual allegations as true, and determine whether the plaintiff undoubtedly can prove no set of facts in support of his claims that would entitle him to relief." In re Delorean Motor Company, 991 F.2d 1236, 1240 (6th Cir. 1993). The complaint must include direct or indirect allegations "respecting all the material elements to sustain a recovery under some viable legal theory." Id. (citations omitted).

17

A motion to dismiss under Rule 12 (b) (6) tests the sufficiency of a complaint.  Elliot Co., Inc. v. Caribbean Utilities Co., Ltd., 513 F.2d 1176, 1182 (6th Cir. 1975).  In a light most favorable to plaintiff, assuming all allegations are true, the court must determine whether the complaint states a valid claim for relief.  A motion to dismiss a complaint for failure to state a claim should not be granted "unless it appears beyond doubt that plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Id. (citations omitted).

Unless a court converts a motion to dismiss into a motion for summary judgment, a court may not consider material that exceeds the scope of the complaint.  "Matters outside of the pleadings are not to be considered by a court in ruling on a 12(b)(6) motion to dismiss." Weiner v. Klais & Co., 108 F.3d 86, 88-89 (6th Cir. 1997)(citing Hammond v. Baldwin, 866 F.2d 172, 175 (6th Cir. 1989)).  In a securities fraud case, however, the Sixth Circuit has instructed that district courts may consider the full text of SEC filings, prospectus, analysts' reports, and statements integral to the complaint, even if not attached to the complaint, without converting a motion to dismiss into a motion for summary judgment.  In re Royal Appliances Sec. Litig. 1995 U.S. App. LEXIS 24626 at *5 (6th Cir. Aug. 15, 1995).

Further, "[d]ocuments that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to [the plaintiff's] claim." Weiner, 108 F.3d. at 89; see also, Lovelace v. Software Spectrum, Inc., 78 F.3d 1015, 1017-18 (5th Cir. 1996)(courts must limit inquiry to facts stated in complaint and documents either attached to or incorporated in complaint; however, courts may also consider matters of which they may take judicial notice).

18

## IV. Analysis

### A. Elements of Section 10(b) Violation

In order to state a claim for securities fraud under Section 10(b) of the Securities Exchange Act, 15 U.S.C. § 78(j)b[4] and Rule 10b-5[5] promulgated thereunder, a plaintiff must allege each of the following elements related to the sale of securities: (1) a misrepresentation or omission; (2) of a material fact; (3) made with scienter; (4) on which plaintiff reasonably relied; and (5) which proximately caused plaintiff's injury. Aschinger v. Columbus Showcase Co., 934 F.2d 1402, 1409 (6th Cir. 1991); Craighead v. E.F. Hutton & Co., Inc., 899 F.2d 485 (6th Cir. 1990). Scienter refers to a "mental state embracing intent to deceive, manipulate, or defraud." Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 (1976).

---

[4] Section 10(b), 15 U.S.C. § 78j(b) provides,

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of . . . any national securities exchange - . . . (b) to employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

[5] Rule 10b-5 of the Commission, 17 C.F.R. 240.10b-5, provides:

> It shall be unlawful for any person . . . (a) to employ any device, scheme, or artifice to defraud, (b) to make any untrue statement of a material fact necessary or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, no misleading, or (c) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

### B. Pleading Standard

#### 1. Pleading Fraud:  Fed.R.Civ.Pro. 9

When a plaintiff alleges that a defendant has engaged in fraudulent activity, Fed.R.Civ.Pro. 9(b) requires that the plaintiff plead its allegations of fraud with particularity.  The Rule requires that, "[i]n all averments of fraud or intent, the circumstances constituting fraud or mistake shall be stated with particularity."  Fed.R.Civ.Pro. 9(b).  The Sixth Circuit has instructed that the pleading requirement is satisfied when the complaint

> specifies the parties and the participants to the alleged fraud, the representations made, the nature in which the statements are alleged to be misleading or false, the time, place and content of the representations, the fraudulent scheme, the fraudulent intent of the defendants, reliance on the fraud, and the injury resulting from the fraud.

Michaels Building Co. v. Ameritrust Co., N.A., 848 F.2d 674, 679 (6th Cir. 1988).

The purpose of Rule 9 is three-fold: (1) it provides defendants with fair notice of the claims against them; (2) it protects defendants from harm to their reputations or goodwill caused by unfounded fraud allegations; and (3) it reduces the number of strike suits and discourages fishing expeditions.  Picard Chemical, Inc. v. Perrigo Co., 940 F.Supp. 1101, 1114 (W.D.Mich. 1996).

Congress was not satisfied that Rule 9 was sufficient to curb abuse of the securities laws by private litigants because "the courts of appeals ha[d] interpreted Rule 9(b)'s requirements in conflicting ways, creating distinctly different standards among the circuits."  Joint Explanatory Statement of the Committee of Conference, Statement of Managers, H.R. Conf. Rep. No. 104-369, 104th Cong. 1st Sess. at 41 (1995), reprinted in 1995 U.S.C.C.A.N. 730, 730-48 ("Conference Committee Report" or "Conference Report").  Therefore, in 1995 Congress passed the Private Securities Litigation Reform Act in an attempt to clarify the pleading requirements for fraud.

### 2. Private Securities Litigation Reform Act (PSLRA)

#### a. Fraud

The Private Securities Litigation Reform Act (PSLRA), Pub.L. No. 104-67, 15 U.S.C. § 78u-4(b)(1) & (2), sets pleading requirements for securities fraud actions.   Section 78u-4(b)(1) provides that in a securities action where the plaintiff claims the defendant made misleading statements of fact, "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1).  At the outset, and without regard to scienter, Plaintiffs have failed to properly plead an action for securities fraud because they have failed to specifically allege any misstatement or omission of material fact on the part of Defendants.

#### i. Dealer Enrollment Fees

The alleged scheme is said to have arisen from Defendants' overstatement of revenues from dealer enrollment fees and Defendants' understatement of the reserve for losses on dealer advances. (Pls' Second Am. Compl. at ¶¶ 3(a)-(b)).  However, Plaintiffs' allegations with respect to the scheme are not supported by facts, but rather are conclusory in nature. With respect to the dealer enrollment fees, Plaintiffs repeat the theory set forth in their previous complaint that the fees were fictitious because they were being paid back to the dealers in the form of advances. However, Plaintiffs themselves recognize that the dealer advances are paid after a dealer sells a car and CAC accepts assignment of the installment contract.  (Pls' Second Am. Compl. at ¶¶ 27-28).  The "advance" is a prepayment of a portion of the dealer's sale of the installment contract.

21

Plaintiffs supplement their dealer enrollment theory with allegations that CAC allowed dealers to sign promissory notes instead of actually paying the enrollment fee. (Pls' Second Am. Compl. at ¶ 66).  This allegedly misrepresented CAC's revenue because under GAAP such promissory notes should not be recognized as revenue.  Id.  Plaintiffs' claim boils down to the allegation that the enrollment fees were recorded as revenue without regard to whether or not CAC ever collected the $4,500.  However, as disclosed in CAC's financial statements, whether the enrollment fees were paid up front or in the form of promissory notes, the fees were not recognized as revenue unless collections were made. Plaintiffs' own accounting expert does not find fault with the manner in which CAC recognized revenue from dealer enrollment fees.

### ii. Understated Reserve for Loss on Dealer Advances

Plaintiffs' allegations that CAC's reserve for losses on dealer advances was understated during the class period are devoid of allegations of fact.  In their Amended Complaint, Plaintiffs attempt to assert facts which allegedly indicate that Defendants could have known during the class period that their reserves were understated.  They conducted interviews with former and unidentified employees of CAC and allege that one regional manager stated that "one could figure out how the pools were performing with pencil and paper."  And that another regional manager stated that there was "no way a computer system could tell them anything new without them already knowing it."  (Pls' Second Am. Compl. at ¶ 131.)  Plaintiffs have not set forth specific allegations of fact, plead with particularity, which would tend to suggest or give rise to the inference that CAC fraudulently understated its reserves.

The affidavit of Michele M. Stanton does little to bolster Plaintiffs' bare assertions of fraud. She concludes, "In my opinion, CAC's failure to reserve for adequate credit losses was an error under GAAP."  Stanton Aff. at ¶ 13.  She does not allege that CAC untruthfully contended that

22

it had state of the art systems for analyzing its data related to installment contracts, or that CAC did not actually review dealer advance balances on a monthly basis.  Rather, she concludes "[r]egardless of the reason for the error, when CAC discovered that its dealer advances were overstated and a material provision was required, GAAP required calculation and allocation of the amounts applicable to prior periods and adjustment and disclosure of the restatement of previously issued financial statements."  Id.

### iii. Statements to Securities Analysts

Plaintiffs fail to allege with specificity what misleading statements were made to securities analysts.  This Court noted this defect in the prior complaint when it recognized that Plaintiffs failed to identify who misstated what, when, and to whom with respect to their allegations that Defendants mislead analysts during the September 1995 "road show" for CAC's secondary offering.  See Defs' Exb. B. at 29.  The Amended Complaint does not cure this defect.  Rule 9(b) requires Plaintiffs to plead the "who, what, when, where and how."  DiLeo v. Ernst & Young, 901 F.2d 624, 627 (7th Cir. 1990).  The PSLRA requires that each statement alleged to be misleading be identified.  15 U.S.C. § 78u-4(b)(1).  Plaintiffs' attempt to be more specific by alleging that "it was the Company's practice to have Defendants Beckman and Roberts communicate regularly with securities analysts at the firms identified above (and others), on a regular basis, to discuss, among other things, the Company's operating results and anticipated revenues and to provide detailed 'guidance' to these analysts with respect to the Company's business and anticipated revenues and earnings," (¶ 119) does not suffice.  The Amended Complaint is devoid of any specific example of a material misstatement made by any specific Defendant to any specific securities analyst.

23

Similarly, Plaintiffs allege that Defendants "materially misrepresented" and "falsely valued" the underlying collateral through the improper use of Kelley Blue Book Western Edition values. Plaintiffs allege that in December of 1995, CAC changed its dealer advance formula to 50% of the amount financed, to no greater than 50% of the Kelley Blue Book value of the car. Plaintiffs allege that Defendants fraudulently represented to the public and investors that CAC systematically advanced more the 50% limit. However, in its prospectus, CAC disclosed that it may advance up to 90% of the total amount financed by the consumer. Most importantly, even if the Court accepts Plaintiffs' contention that the use of Kelley Blue Book Western edition values increased the risk of loss, Plaintiffs fail to connect Defendants' knowledge of the increased risk to the understatement of the loss reserve.

The Amended Complaint contains numerous bare conclusions, but does not allege fraud with particularity. As discussed below, even assuming that the Amended Complaint adequately alleges fraud, the Amended Complaint must be dismissed because it fails to give rise to a strong inference that the understatement of the reserve for losses on dealer advances resulted from reckless behavior on the part of Defendants.

### b. Scienter

At the time this Court dismissed the initial complaint, the district courts were in disagreement over the impact of Congress' enactment on the pleading standard for scienter in this context, and the Sixth Circuit had not yet considered the issue. The Sixth Circuit in In re Comshare, Inc. Sec. Litig., 183 F.3d 542 (6th Cir. 1999), recently addressed the issue of whether, under the heightened pleading standard of the PSLRA, a plaintiff could survive a motion to dismiss by alleging facts giving rise to a strong inference of recklessness or of motive and opportunity. In Comshare, the Sixth Circuit made clear that "plaintiffs may plead scienter in § 10b

24

or Rule 10b-5 cases by alleging facts giving rise to a strong inference of recklessness, but not by alleging facts merely establishing that a defendant had the motive and opportunity to commit securities fraud." Id. at 549. Accordingly, the court of appeals affirmed the district court's dismissal of the plaintiffs' complaint, but on different grounds, rejecting the district court's formulation of the standard which required that plaintiffs "plead specific facts that create a strong inference of knowing misrepresentation on the part of the defendants." Id.[6]

After an analysis of the legislative history of the Act, Sixth Circuit elaborated on its formulation of the standard with respect to motive and opportunity:

> Consequently, we cannot agree that under the PSLRA, plaintiffs may establish a "strong inference" of scienter merely by alleging facts demonstrating motive and opportunity where those facts do not simultaneously establish that the defendant acted recklessly or knowingly, or with the requisite state of mind. While the facts regarding motive and opportunity may be "relevant to pleading circumstances from which a strong inference of fraudulent scienter may be inferred," . . . and may, on occasion, rise to the level of creating a strong inference of reckless or knowing conduct, the bare pleading of motive and opportunity does not, standing alone, constitute the pleading of a strong inference of scienter. Thus, under a plain interpretation of the PSLRA as informed by well-settled law on the contours of the "scienter" requirement, we hold that plaintiffs may meet PSLRA pleading requirements by alleging facts that give rise to a strong inference of reckless behavior but not by alleging facts that illustrate nothing more than a defendant's motive and opportunity to commit fraud.

Id. at 551 (citations and footnote omitted).

---

[6] In testing the sufficiency of the previous complaint in this matter with respect to whether Plaintiffs adequately plead scienter, this Court required Plaintiffs to " plead with particularity facts giving rise to a strong inference of conscious behavior, i.e., a knowing misrepresentation, on the part of the Defendants," and noted that "[a] showing of motive and opportunity or mere recklessness will not suffice." Defs' Exb. B at 22. Nonetheless, after testing the previous complaint against this standard, the Court, in the alternative, applied a recklessness standard, and held that Plaintiffs' complaint was insufficient under that pleading standard also. Id. at 27-32.

Comshare involved an alleged scheme to defraud plaintiffs by "knowingly or recklessly disregarding [] acknowledged errors in revenue recognition." Id. at 547. Plaintiffs alleged that "through its public misrepresentations about its revenue, Defendants fraudulently induced Plaintiffs to purchase Comshare stock at artificially inflated prices . . . . " Id. at 547. Comshare's business derives its revenue from software license fees. Revenue is not recognized until a customer contract is fully executed and the software is shipped. In July of 1996, Comshare delayed publication of its quarterly report because it had yet to complete an audit of its UK subsidiary. Id. at 546. Comshare subsequently discovered side letters setting forth conditions in certain foreign orders which violated the Company's revenue recognition policy. No violations were found among domestic orders, however, the company's overall growth in software license revenue was negatively impacted by the UK subsidiary's violations. Indeed, the company's stock price dropped several points after the company announced the error. Comshare took corrective action. Plaintiff-shareholders sued.

The Comshare plaintiffs alleged several sources of scienter on the part of the defendants which the court of appeals held failed to survive a motion to dismiss . Id. at 554. Plaintiffs alleged (1) stock sales by key managers; (2) failure to follow GAAP; and (3) subsequent revelation of the falsehood of previous statements. The Sixth Circuit addressed each source of knowledge in turn. With respect to stock sales, the court noted that the fact that the individual defendants stood to gain financially from stock sales at alleged inflated prices tends "to illustrate that [d]efendants had the motive and opportunity to commit fraud." Id. at 553. The court noted however that allegations of motive and opportunity do not, standing alone, satisfy the standard, nor did they give rise to a strong inference of recklessness, or lead to the inference that "the revenue recognition errors at the heart of this case were 'so obvious that any reasonable man

would have known of [them].'" Id. (quoting Mansbach v. Prescott, Ball & Thurben, 598 F.2d 1017, 1025 (6th Cir. 1979)).

With respect to the import of the alleged GAAP violations, the Sixth Circuit stated that plaintiffs failed to allege facts showing that "Defendants knew or could have known of the errors, or that their regular procedures should have alerted them to the errors sooner than they actually did." Id. at 553. On this point, the court of appeals elaborated, "Plaintiffs have not alleged specific facts that illustrate 'red flags' that should have put Defendants on notice of the revenue recognition errors, or that demonstrate reasons for Defendants to have questioned the revenue reporting of its UK subsidiary." Id.

Finally, the Comshare Court stressed that allegations of securities fraud cannot "rest on speculation and conclusory allegations." Id. The court reminded us that "recklessness or intentional misconduct" should not be presumed based on "a parent corporation's reliance of its subsidiary's internal controls." Id. at 554. In sum, the court stated:

> Because Plaintiffs have failed to plead facts that show that the revenue recognition errors at Comshare's UK subsidiary should have been obvious to Comshare or that Comshare consciously disregarded "red flags" that would have revealed the errors prior to their inclusion in public statements, we conclude the Complaint fails to allege facts that give rise to a strong inference of scienter under § 10(b) and Rule 10b-5.

Id. at 554.

Thus, under the holding in Comshare, this Court must determine whether Plaintiffs have plead scienter by "alleging facts giving rise to a strong inference of recklessness, but not by alleging facts merely establishing that a defendant had the motive and opportunity to commit securities fraud." Comshare, 183 F.3d at 549.

27

### C. Analysis of Alleged Scienter

As discussed below, the Court finds that Plaintiff's Amended Complaint, like the prior complaint, is insufficient to meet the pleading requirements of the PSLRA for scienter in light of the Sixth Circuit's decision in <u>Comshare</u>.   This Court previously held that Plaintiffs had not alleged the requisite scienter.  In doing so the Court initially applied a stricter standard than that set forth in <u>Comshare</u>.  The Court asked "whether Plaintiffs have plead with particularity facts giving rise to a strong inference of conscious behavior, i.e. a knowing misrepresentation, on the part of the Defendants." (Defs' Exb. B at 22).  The Court alternatively decided that Plaintiffs' complaint failed under a recklessness analysis as well. As discussed below, in light of <u>Comshare</u> and the allegations set forth in the Amended Complaint, Plaintiffs have not met their burden.

### 1. Defendants' Knowledge of the Alleged Errors

In holding that the plaintiffs in <u>Comshare</u> had inadequately plead scienter under the standard applied by the Sixth Circuit, the Court of Appeals noted that plaintiffs "allege[d] no facts to show that Defendants knew of or could have known of the errors, or that their regular procedures should have alerted them to the errors sooner than they actually did." <u>Comshare</u>, 183 F.3d at 553.  Plaintiffs here allege no facts  tending to show that "[d]efendants knew of or could have known of the errors."  The alleged error is that during the class period Defendants overvalued their collateral and inadequately assessed the risk of default, causing Defendants to have to charge off $60 million to loan loss reserves in 1997, and again in 1999.

Plaintiffs contend that Defendants knew that they were being sued all over the country by consumers for engaging in shoddy business practices.  In this Court's previous opinion, the Court found the Plaintiff's allegations of scienter based on CAC's knowledge of the Akron

Litigation to be inadequate to support an inference that Defendants acted recklessly concerning the adequacy of loss reserves.  The Court stated:

> even assuming that Foss had knowledge of the business practices at Larry Lee's and assuming that those practices were less than above board, those allegations do not support the contention that the Defendants had knowledge that the business practices of the other 2,400 unaffiliated dealerships were similarly shoddy.    Plaintiffs attempt to use the testimony regarding one of eleven dealerships owned by Foss as an indication of knowledge on the part of the Defendants that overvaluing used cars was a common practice among the dealerships with which CAC did business does not give rise to a strong inference that Defendants knew their loan loss reserve pool was inadequate.

(Defs' Exb. at 24).

In their Amended Complaint, Plaintiffs assert that, beyond the alleged fraud at Larry Lee's, Defendants knew that CAC was being sued all over the country for engaging in fraudulent business practices.  Indeed, CAC was involved in consumer fraud litigation in California, Michigan, Minnesota, Missouri, and elsewhere.  The crux of Plaintiffs' argument is that because Defendants knew they were being sued by consumers all over the country due to certain dealerships who were selling overvalued used cars to individuals with past credit problems, the risk of default was high and they should have known that CAC would be unable to collect dealer enrollment fees, or its dealer advances from collections on installment contracts.  The existence of this consumer fraud litigation simply does not give rise to this inference, nor do the other allegations in the Amended Complaint.

Furthermore, even if CAC experienced an increased risk of loss due to the allegedly shoddy practices of some of its dealers, Plaintiffs' allegations do not support the conclusion that Defendants failed to adequately account for that risk when estimating the appropriate reserve for future losses.  The amount CAC advances to a dealer is dependent upon numerous factors, including the dealer's rating, the purchaser's credit rating, the value of the car, and general

29

economic conditions.  Nothing in the complaint suggests that Defendants failed to account for the increased risk of loss that the prolific consumer fraud litigation may have signaled.  Indeed, Defendants increased their reserve for losses during the class period.

### 2. Red Flags

In holding the plaintiff's complaint insufficient to plead scienter in <u>Comshare</u>, the court of appeals also observed that "Plaintiffs have not alleged specific fact that illustrate 'red flags' that should have put Defendants on notice of the revenue recognition errors, or that demonstrate reasons for Defendants to have questioned the revenue reporting of its UK subsidiary."  <u>Comshare</u>, 183 F.3d at 553.  In their Amended Complaint, Plaintiffs have alleged numerous "red flags" which they contend suggest that Defendants should have been on notice that the loan loss reserve pool was inadequate.

For example, Plaintiffs point to six red flags: (1) as of December 31, 1996 nearly half of CAC's loans that could be 120 days delinquent, were delinquent; (2) CAC's charge-off policy was more lenient that its competitors, which yielded a greater likelihood of defaults;       (3) the ratio of cash collections to average gross portfolio declined from 50% in 1994 to 38% in 1996; (4) between 1994 and 1996, dealer advances as a percentage of outstanding contracts increased from 27% to 40%, and dealer hold back payments as a percentage of average portfolio declined from 31% to 12%.  These figures signal that the risk of loss on contracts was increasing.  "According to one regional manager, CAC was aware of substantial problems with its loan portfolio in February of 1997 and internally implemented changes in its dealer rating system because of these problems."  (Pls' Second Am. Compl. at ¶ 126); (5) the fraudulent practices of CAC-affiliated dealers contributed to the Company's deteriorating loan portfolio and ultimate

decision to take the large loan charge; (6) the numerous lawsuits pending against CAC throughout the country were ignored.

These red flags do not give rise to the inference that Defendants acted recklessly by ignoring these business indicators.  The items listed above were disclosed in the company's financial statements.   They were not hidden from the public, nor were they ignored.  Indeed, during the class period, CAC actually increased its reserve for losses on advances.  In 1994 the reserve was $1,557,000 or 1.18% of 1994 outstanding advances of $131,616,000.  This figure was increased in 1996 to $8,754,000 or 1.74% of 1996 outstanding advances of $502,159,000. CAC's financial disclosures show that as the ratio of advances to installment contract increased from 27% to 40%, a 48% increase, Defendants correspondingly increased the reserve from 1.2% to 1.7% of the outstanding advance balance, a 47.5% increase.  Thus the disclosures in CAC's financial statements reveal that the business was responding to its increased risk of loss.  By 1997, the reserve was increased to $14,168,000 when the outstanding advance balance was $566,861,000.

### 3. Inappropriate Use of Kelley Blue Book Values

Even if the Court accepts the allegations as pleaded by Plaintiffs that the use of the Kelley Blue Book Western Edition was inappropriate and it increased CAC's risk of loss, Plaintiffs do not allege a connection between use of the valuation method and knowledge about the understatement of reserves.  Plaintiffs' allegations also do not give rise to the inference that Defendants recklessly ignored any increased risk when estimating the amount of loss reserves.

### 4. Stock Sales

As the Court previously found, the stock sales by Foss and Beckman during the class period do not give rise to a strong inference that Defendants had a motive not to adequately account for loan loss reserves.  As this Court discussed in its earlier opinion, neither the timing nor the volume of the stock sales were unusual.  See Defs' Exb. B at 24-26.

### 5. GAAP Violations

Plaintiffs point to the alleged GAAP violations as another source evidencing recklessness.  GAAP violations, standing alone, are not sufficient to state a claim for securities fraud.  In re Comshare, Inc. Sec. Litig., 183 F.3d 542, 553 (6th Cir. 1999); In re Software Toolworks, Inc. Sec. Litig., 50 F.3d 615, 627 (9th Cir. 1994).

### 6. The Court's Previous Ruling Re: Recklessness

In its previous ruling in this case, the Court held that Plaintiffs' complaint was not sufficient to state a claim for securities fraud because it failed to properly alleged scienter.  In doing so, the Court distinguished three cases involving factually similar allegations.  See Defs' Exb. B at 27-30, discussing Rehm v. Eagle Finance Corp., 954 F.Supp. 1246 (N.D.Ill. 1997); In re Olympic Financial Ltd. Sec. Litig., 1998 U.S. Dist. LEXIS 14789 (D.Minn. Sept. 10, 1998); and In re First Merchants Acceptance Corp. Sec. Litig., 1998 WL 78118 (N.D. Ill. Nov. 4, 1998).  The Court finds nothing in Comshare, or in the Amended Complaint, which requires a different analysis of those decisions.

In sum, Plaintiffs have attempted to bolster their previous allegations of scienter by adding three alleged sources of knowledge: (1) consumer fraud litigation pending throughout the

32

country; (2)  added allegations regarding the alleged inappropriate use of Kelley Blue Book values in determining the amounts of dealer advances; and (3) red flags which Defendants allegedly ignored.  As discussed above, the Court finds the Amended Complaint fails to allege facts giving rise to a strong inference of recklessness.

The Court's analysis is bolstered by the recent case of In re Green Tree Financial Corp. Stock Litig., 61 F.Supp2d 860 (D. Minn. 1999). Green Tree involved a diversified financial services company that financed manufactured homes. Id. at 864. The company's revenues and earnings are based on loan performance.  During the relevant time period, the loan pools which Green Tree securitized from 1994 and 1995 were being prepaid at a faster rate than defendants projected in calculating revenue. Id. at 865. Defendants responded to this problem by making several changes, including increasing prepayment and loss reserves and increasing prepayment speeds. Id.  Nevertheless, the defendants were forced to admit that their earnings were overstated in 1996.  They took a $200 million write-down and restated 1996 earnings.  In addition, for the fourth quarter of 1997, the company added $190 million to its prepayment reserves. Id. at 866. This error was revealed after the defendants undertook a special review of prepayment rates.  Company managers whose bonuses were based on earnings had to recalculate their bonuses for the years in question.  For example, the CEO gave back $25.9 million for 1996. Id.

The court held that Plaintiffs failed to allege the requisite level of scienter, either under a "motive and opportunity" analysis, or under a "knowing or reckless misbehavior" analysis. The court noted that defendants' knowledge that the prepayment rates were higher than assumed "did not give rise to a strong inference that they knew or recklessly disregarded that its earnings were overstated." The court reasoned that the prepayment assumption "was but one, albeit significant,

33

variable in determining the value of the Interest Only Securities and earnings." Id. at 876. The court also found it important that the company made adjustments throughout the class period in an attempt to compensate for the greater than expected prepayments. This case is indistinguishable from Green Tree. As in Green Tree, Defendants here made adjustments for loan loss reserves throughout the class period. Also, several factors go into determining the adequacy of CAC's reserve for losses, including the credit integrity of dealers and consumers, the value of the underlying collateral, the success rate of collection efforts, and general economic conditions. Defs' Reply Br. at 17. See also In re Advanta Corp. Sec. Litig., 180 F.3d 525 (3d Cir. 1999).

Plaintiff's Second Amended Consolidated Class Action Complaint is DISMISSED WITH PREJUDICE.[7]

## V. Conclusion

Being fully advised in the premises, having read the pleadings, and for the reasons set forth above, the Court hereby orders as follows:

Defendants' motion to dismiss Plaintiffs' Second Amended Consolidated Class Action Complaint is GRANTED.

IT IS FURTHER ORDERED THAT Plaintiffs' Second Amended Consolidated Class

---

[7] There being no adequately plead violation of § 10(b) or Rule 10b-5, there can be no "controlling person" liability under § 20(a). Shapiro v. UJB Fin. Corp., 964 F.2d 272, 279 (3d Cir. 1992).

Action Complaint be DISMISSED WITH PREJUDICE.

SO ORDERED.

Nancy G. Edmunds
U. S. District Judge

**MAR 2 4 2000**

Dated: _____

PURSUANT TO RULE THIS ORDER
COPIES HAVE BEEN MAILED TO:,
Gerard Mantese – Andrew
McGinness – Lionel
Glancey – Stanley
Bernstein – Timothy Nelson

MAR 2 4 2000

DEPUTY COURT CLERK